UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TERRENCE GARRETT,

             Plaintiff,                 CIVIL ACTION NO. 09-13141

          v.                     DISTRICT JUDGE AVERN COHN

SCOTT ADAMS, TROY SZUKHENT,    MAGISTRATE JUDGE VIRGINIA MORGAN
MICHIGAN STATE POLICE
DEPARTMENT, STATE OF MICHIGAN,
TIM LIGHT, GENESEE COUNTY SHERIFF'S
DEPARTMENT, COUNTY OF GENESEE,
DENNIS CHASE, BRIAN SAVARD, AARON
QUINN, TIM BUECHE, GRAND BLANC
TOWNSHIP POLICE DEPARTMENT, and
TOWNSHIP OF GRAND BLANC,

             Defendants.



                 __REPORT AND RECOMMENDATION__
__TO GRANT SUMMARY JUDGMENT TO THE REMAINING DEFENDANTS__

## I. Introduction

       This is a *pro se* 42 U.S.C § 1983 action in which the plaintiff, an inmate in the custody of

the Michigan Department of Corrections (MDOC), alleges that the defendants violated his

constitutional rights by using excessive force during his arrest and subsequently conspiring to

cover-up that use of excessive force.  All defendants filed motions to dismiss and/or for

summary judgment (D/E #75, #78, #79).  Following review of this court's Report and

Recommendation (D/E #99),  defendants Chase, Quinn, Michigan State Police Department, State

-1-

of Michigan, Genesee County Sheriff's Department, Genesee County, Grand Blanc Township Police Department, and Grand Blanc Township were dismissed from this action and granted summary judgment by the district judge. The district judge also adopted the recommendation to postpone a decision on defendants Adams, Szukhent, Light, Savard or Bueche's requests for summary judgment pursuant to Fed. R. Civ. P. 56(f) until plaintiff had the opportunity to conduct additional discovery, i.e. viewing of a video of the incident (D/E #106).

On February 16, 2011, defendants produced two DVDs and an audio recording which the court and plaintiff viewed and heard at the evidentiary hearing before the magistrate judge. The court also heard oral arguments. After considering the evidence and for the reasons discussed below, this court now recommends that defendants Adams, Szukhent, Light, Savard and Bueche also be granted summary judgment on all claims against them and this case be closed.

## II. Background

### A. Facts in the Record

This case arises out of events that occurred on June 23, 2009. On that date, plaintiff was driving on northbound I-75 in his daughter's Chevrolet Venture. (Plaintiff's Deposition, pp. 29, 33, 139)[1] Plaintiff was driving and alone, but he did not have a valid driver's license as his driver's license had been suspended in 2003. (Plaintiff's Deposition, pp. 29, 33) Eventually, a police car behind plaintiff turned on its lights and sirens. (Plaintiff's Deposition, pp. 34-35) In response, plaintiff stopped his vehicle on the shoulder of the road. According to plaintiff, he stopped the vehicle because "that's want you do, you pull over." (Plaintiff's Deposition, p. 35)

---

[1]The transcript of plaintiff's deposition is attached as Exhibit 1 to D/E #75.

The stop was initiated by Grand Blanc Township Police Officer Savard.  (Savard's Incident Report, p. 5)[2]  Savard stated in his affidavit that he stopped plaintiff "based on [Savard's] probable cause determination that [plaintiff] was in violation of Michigan motor vehicle laws; specifically, [plaintiff] was driving a vehicle that had defective equipment, namely a lower tire that was bulging out, and that did not have a rearview mirror."  (Savard's Affidavit, ¶ 3)[3]  Savard's incident report also provides that he observed that plaintiff's vehicle did not have a rear view mirror and that the front passenger side was low and bulged out.  (Savard's Incident Report, p. 5)  The video recording from Savard's vehicle provides that the initial stop occurred at 8:24:15 p.m. (Video Recording from Savard's Vehicle; Defendants' Exhibit 1 at Evidentiary Hearing) while Savard incident report provides that plaintiff first pulled over at 8:26 p.m. (Savard's Incident Report, p. 5)

Plaintiff concedes that the steering column of the vehicle was damaged near the ignition key, the rearview mirror could have been missing, and the front door lock may have been punched out.  (Plaintiff's Deposition, pp. 91-92)  Plaintiff denies having a low front tire. (Plaintiff's Deposition, p. 92)  Plaintiff also testified that, while he had briefly pulled over, he did not want to go to jail for driving with a suspended license and therefore drove off once he observed Savard get out of the patrol car.  (Plaintiff's Deposition, pp. 36-47)[4]  Plaintiff further

---

[2]Savard's incident report is attached as Exhibit 2 to D/E #75.

[3]Savard's affidavit is attached as Exhibit 3 to D/E #75.

[4]While plaintiff testified that he observed Savard get out of the police car, the video recording from Savard's vehicle appears to demonstrates that the police car never came to a complete stop during the initial traffic stop.  (Video Recording from Savard's Vehicel;

testified that, at the time, he thought fleeing and eluding was a misdemeanor. (Plaintiff's Deposition, p. 94)

Savard pursued plaintiff in his patrol car. (Savard's Incident Report, p. 5) The pursuit began on I-75 and continued on to I-475. (Plaintiff's Deposition, p. 139) Deputy Light of the Office of the Genesee County Sheriff joined the pursuit on I-475 in his patrol car. (Light's Affidavit, ¶ 3)[5] Michigan State Police Troopers Szukhent and Adams also joined the police chase in their patrol car. (Adams' Affidavit, ¶ 5; MSP Original Incident Report, p. 1)[6] When they entered I-475 during the chase, the State Police troopers were actually ahead of plaintiff's vehicle. (Adams' Affidavit, ¶¶ 5-6) Officer Bueche of the Grand Blanc Township Police Department also joined the pursuit. (Bueche's Incident Report, p.1)[7]

During the chase, both Bueche and Savard observed numerous clear plastic sandwich bags being thrown out of the driver's side window of plaintiff's vehicle. (Bueche's Affidavit, ¶ 10; Savard's Affidavit, ¶ 10) Plaintiff denies throwing any plastic bags out of a window, but he did testify that "[s]ome stuff flew out the window" due to his speed. (Plaintiff's Deposition, p. 44) Plaintiff also testified that some bags could have flown out the window, but he does not know what was in them. (Plaintiff's Deposition, p. 138) Plaintiff further testified that it was not bags of cocaine flying out of the window because he did not have any. (Plaintiff's Deposition, p.

_____

Defendants' Exhibit 1 at Evidentiary Hearing)

[5]Light's affidavit is attached as Exhibit 2 to D/E #78.

[6]Adams' affidavit and incident report are attached as Exhibit 2 to D/E #79.

[7]Bueche's incident report is attached as Exhibit 4 to D/E #75.

45)  Police later searched for plastic bags, but none were found.  (Savard's Incident Report, p. 6;

Bueche's Incident Report, p. 2)

Plaintiff testified that, during the chase, he never looked at his speed and there were not

many cars on the road.  (Plaintiff's Deposition, pp. 38-39)  Plaintiff was aware he was being

pursued by a number of police vehicles and he acknowledges that the lights and sirens for those

vehicles were all activated.  (Plaintiff's Deposition, p. 43)  Plaintiff also testified that he knew

the police officers wanted him to stop, but he did not stop because he did not want to get

arrested.  (Plaintiff's Deposition, p. 44)

As displayed in the video recording from Savard's vehicle, several minutes minutes

passed between the time plaintiff first sped off and the time he was finally stopped.  (Recording

from Savard's Vehicle; Defendants' Exhibit 1 at Evidentiary Hearing)  Both the audio portions

and the computer documentation show that plaintiff drove at speeds in the range of  95 to well

over 100 miles/hour during the chase, and at such speeds was pulling away from the pursuing

police vehicles.  The recording equipment for Bueche's vehicle displayed that the vehicles were

going over 100 mph.  (Recordings; Defendants' Exhibits 1-3 at Evidentiary Hearing)  Moreover,

the video recordings also demonstrate that there were numerous civilian cars on the road during

the pursuit and that, at one point, plaintiff started to exit the highway before swerving back on.

(Video Recordings; Defendants' Exhibits 1-2 at Evidentiary Hearing).

Ultimately, plaintiff's vehicle come upon the police vehicles which had entered on the

highway in front of him (set up more or less as a rolling road block) and the law enforcement

officers successfully forced him to pull over.  Szukhent and Adams were in front of plaintiff's

vehicle,  Light was on plaintiff's left, a Grand Blanc Township Police vehicle was directly

behind plaintiff, and a guard rail was on plaintiff's right.  Plaintiff testified that he only pulled

over and stopped because there were cars in front of him and it was difficult to keep going.

(Plaintiff's Deposition, p. 49)

Plaintiff and the remaining defendants all offered their accounts of what happened after

plaintiff stopped his vehicle.  Plaintiff testified that he eventually pulled over because it was

difficult to keep going and that, after he pulled over, he took the keys out of the ignition, set

them down, and put his hands up.  (Plaintiff's Deposition, pp. 49, 51)  According to plaintiff, that

was the difference between the first and second time he stopped the car.  (Plaintiff's Deposition,

pp. 103-104)  Plaintiff further testified that various police officers approached his car, with the

State Police coming in from the front, the Genesee County officers approaching from the side,

and the Grand Blanc police advancing from the back.  (Plaintiff's Deposition, pp. 54-55)

According to plaintiff, the Michigan State Police officers were yelling to tase plaintiff as

they approached, a Genesee County officer was telling plaintiff not to move, and a Grand Blanc

officer was ordering plaintiff to get out of the vehicle.  (Plaintiff's Deposition, p. 51)  Plaintiff

asserts that he did not know what to do given the conflicting orders he was receiving and so he

just sat there with his hands up.  (Plaintiff's Deposition, p. 52)  Plaintiff testified that a police

officer tased him through the window, but he does not know which officer did it.  (Plaintiff's

Deposition, pp. 56, 134-135)  The prongs of the taser hit plaintiff in the chest.  (Plaintiff's

Deposition, pp. 58-61)  Plaintiff also testified that his body felt paralyzed after being tased and

the officers pulled him out of the car.  (Plaintiff's Deposition, p. 61)

-6-

Plaintiff further testified that, after being pulled out of the car, he was thrown on the ground and one officer kicked him in the head.  (Plaintiff's Deposition, p. 62)  Another officer, Bueche, had his knee in plaintiff's back and twisted plaintiff's arm.  (Plaintiff's Deposition, pp. 62, 108)  Bueche also had his knee in plaintiff's back.  (Plaintiff's Deposition, p. 109)  The police were keeping plaintiff on the ground and he could not have gotten up if he tried.  (Plaintiff's Deposition, pp. 117-119)  According to plaintiff, while outside of the car, he heard someone say to tase plaintiff again and plaintiff was tased again.  (Plaintiff's Deposition, p. 61)  Plaintiff testified that his hands were behind his back and he was handcuffed when he was tased the second time.  (Plaintiff's Deposition, pp. 61-63)  Plaintiff thinks he was tased several times while on the ground.  (Plaintiff's Deposition, p. 63)

In his incident report, Savard wrote that he exited his patrol car and approached the rear of plaintiff's vehicle.  As he did so, Savard observed Szukhent and Adams, with guns drawn, ordering plaintiff out of the vehicle.  Savard also wrote that he and Szukhent yelled several times for plaintiff to exit the vehicle and get on the ground.   However, according to Savard's report, plaintiff tensed up and would not take his hands off the steering wheel.  Savard further wrote that the officers then tried to pull plaintiff out, but plaintiff still would not take his hands off the steering wheel and Light tased him.  Savard also wrote that plaintiff was still resisting and Szukhent drive stunned him with a taser.  Plaintiff then went to the ground.  (Savard's Incident Report, p. 6)  Savard further stated in his affidavit that he never asked anyone to use a taser and that he "had neither the means nor opportunity to prevent its use in this case."  (Savard's Affidavit, ¶ 7)

-7-

In his incident report, Bueche wrote that he also approached plaintiff's vehicle from the rear and heard other officers yelling at plaintiff to exit the vehicle. (Bueche's Incident Report, p. 1) Plaintiff would not take his hands off the steering wheel, even after the loud commands. (Bueche's Incident Report, pp. 1-2) Bueche also wrote that the officers attempted to pull plaintiff out of the vehicle, but plaintiff tensed up and refused to go. (Bueche's Incident Report, p. 2) Light then tased plaintiff. (Bueche's Incident Report, p. 2) Bueche further wrote that plaintiff continued to struggle until Szukhent drive stunned plaintiff with a taser. (Bueche's Incident Report, p. 2) Plaintiff then went to the ground and Bueche handcuffed him. (Bueche's Incident Report, p. 2) Bueche also stated in his affidavit that he never asked anyone to use a taser and that he "had neither the means nor opportunity to prevent its use in this case." (Bueche's Affidavit, ¶ 5)

Light stated in an affidavit that he approached plaintiff's vehicle with his weapon drawn and that, despite loud commands from officers to exit the vehicle, plaintiff refused to do so. (Light's Affidavit, ¶ 5) Light also stated that he observed a Michigan State Police trooper deploy a taser and plaintiff was removed from the vehicle. (Light's Affidavit, ¶¶ 7-8) Light further stated that plaintiff "was drive stunned by a Michigan State Police Trooper prior to being handcuffed in order to gain compliance." (Light's Affidavit, ¶ 9) According to Light, he never brought out or used his taser during the incident. (Light's Affidavit, ¶ 10) The taser report attached to Light's affidavit also provides that Light's taser was not used. (Taser Report; attached as Exhibit 3 to D/E #3)

-8-

Adams stated in his affidavit that he approached plaintiff's vehicle on the passenger's side and could see Szukhent loudly ordering plaintiff to exit the vehicle, which plaintiff ignored. (Adams' Affidavit, ¶ 8)  Adams also stated that Szukhent attempted to remove plaintiff while Adams ordered plaintiff to submit, but plaintiff refused.  (Adams' Affidavit, ¶ 8)  According to Adams:

> Tpr. Szukhent's inability to remove the plaintiff from the vehicle resulted in a safety concern for the plaintiff and Tpr. Szukhent.  Under the circumstances, I decided the most effective means to make the arrest was to use the taser.  I shouted, "TASER!" in order to warn Tpr. Szukhent so he would not become an unintended target.  I pointed the taser in the plaintiff's direction and again shouted, "TASER!"  Then I deployed the taser and the prongs struck the plaintiff into his center mass area, i.e. chest/stomach region.  I aimed toward the plaintiff's chest/stomach area because this was the safest and most effective area that would deliver the stun.  This taser deployment delivered a five second cycle which was effective in temporarily immobilizing the plaintiff so that he could be safely removed from the car.

(Adams' Affidavit, ¶ 9)  Adams further stated:

> After the initial taser deployment, I expected to see that the plaintiff had been handcuffed, but after I walked around the front of the plaintiff's vehicle, I noticed that Tpr. Szukhent and the Grand Blanc officers were unable [to] secure the plaintiff into handcuffs.  The officers commanded the plaintiff to put his hands behind his back, but he did not comply.  Instead, the plaintiff raised his hands and arms above his head, while the officers attempted to pull the plaintiff's hands behind his back.  This also presented a dangerous situation for the plaintiff and the officers.  As a result of these circumstances, I used the taser to deliver drive stuns to the back of the plaintiff's calf until he complied and allowed officers to control him.  Only then were the officers able to place the plaintiff's hands behind his back and secure the handcuffs.

(Adams' Affidavit, ¶ 10)

Moreover, in describing the use of the taser, Adams also stated:

The taser contained a cartridge which propels small probes which penetrate the skin to deliver electricity and disrupt the electro-muscular system. Once deployed, the taser will deliver a five second cycle of electricity which is designed for temporary immobilization. When the cartridge is removed, the taser may also be used to deliver a small shock which is referred to as a "drive stun." Instead of using probes which enter the body and deliver the stun which then immobilizes the majority of the body, a drive stun delivers electricity to a specific point on the body. The taser has two contact points which make a circuit. When those contact points are placed onto a person, the stun is delivered.

(Adams' Affidavit, ¶ 4)[8]

The video recording of the arrest comes from Savard's vehicle. (Video Recording from Savard's Vehicle; Defendants' Exhibit 1 at Evidentiary Hearing)  The video shows that plaintiff was finally stopped at 8:28:55 and, within seconds, the police approached the vehicle. It is difficult to observe the interactions between plaintiff and the police, but there was some interaction through the window of the vehicle and plaintiff's driver's side door was opened at 8:29:13.  Multiple police officers then pulled plaintiff from the vehicle and to the ground. Again, it is difficult to observe what happened, but plaintiff was clearly handcuffed and secure by 8:30:00 at the latest.  The audio for the video consists mainly of sirens and indecipherable

---

[8]This court would note that defendant Szhkhent also described his version of the events giving rise to this case in an affidavit. (Szukhent's Affidavit; attached as Exhibit 1 to D/E #79) However, that affidavit is unsigned and defendants never provided a signed affidavit as they asserted they would. In his unsigned affidavit, Szukhent stated that, immediately after plaintiff stopped, he approached plaintiff's vehicle on the driver's side and yelled at plaintiff to show his hands. (Szukhent's Affidavit, ¶ 6) Szukhent also stated that plaintiff refused to get out of the vehicle or unbuckle his seatbelt after Szukhent told him to. (Szukhent's Affidavit, ¶ 6) Szukhent further stated that attempts to remove plaintiff from the vehicle failed because of plaintiff's physical resistance. (Szukhent's Affidavit, ¶ 7) According to Szukhent, Adams announced "taser" and deployed a taser on plaintiff's stomach/chest region. (Szukhent's Affidavit, ¶ 7) The officers were then able to remove plaintiff from the vehicle. (Szukhent's Affidavit, ¶ 7) Szukhent also stated that plaintiff continued to resist arrest while on the ground, so Adams drive stunned plaintiff in the calf until plaintiff relented. (Szukhent's Affidavit, ¶ 8)

-10-

yelling, but there are clear statements from officers telling plaintiff to exit the vehicle as they approach and plaintiff complaining about pain while on the ground.

Plaintiff was arrested and placed in the custody of the Grand Blanc Township Police Department.  (Savard's Incident Report, p. 6; Bueche's Incident Report, p. 2)  Light stated in his affidavit that he asked plaintiff if plaintiff needed any medical attention and plaintiff said no. (Light's Affidavit, ¶ 13)  However, plaintiff does not recall being asked that by Light and his only recollection of Light was seeing Light pull up in his vehicle.  (Plaintiff's Deposition, p. 135)  Plaintiff does acknowledge that he did not tell the officers after being arrested that he needed medical attention at the scene of the traffic stop.  (Plaintiff's Deposition, p. 65)  During his deposition, plaintiff testified that he filled out a Pre-booking Health Questionnaire at the Genesee County Jail and, in that form, plaintiff circled "no" in response to a question asking if he was injured in any way upon arrest.  (Plaintiff's Deposition, pp. 126-128)  Plaintiff also testified that the only medical treatment he received was some Tylenol at the jail, but he never told anyone he suffered headaches as a result of the arrest.  (Plaintiff's Deposition, pp. 78, 131) Plaintiff further testified that he had some short-term pain after being tased, but no other injury during the incident and that he suffered no permanent physical injuries.  (Plaintiff's Deposition, pp. 67, 75-76)  Plaintiff does feels like he suffered emotional distress from being tased. (Plaintiff's Deposition, p. 82)

Subsequently, plaintiff pled guilty to Fourth Degree Fleeing and Eluding.  (Plaintiff's Deposition, p. 67)  He was sentenced to two to three years imprisonment for that conviction. (Plaintiff's Deposition, p. 67)

-11-

**B. Procedural History**

On November 13, 2009, plaintiff filed the complaint in this action (D/E #1).  On November 13, 2009, plaintiff subsequently amended his complaint pursuant to a court order (D/E #21).  In that amended complaint, plaintiff alleges that his constitutional right, under the Eighth Amendment[9] to the United States Constitution, to be free from cruel and unusual punishment "was violated by the arresting officers when he was unjustly tazed by them and assaulted after surrendering[.]"  (Amended Complaint, p. 4)  Plaintiff also claims that, following his arrest, the law enforcement officers conspired to falsify their police reports in order to make it appear that plaintiff was resisting arrest and to justify the tasing and assaults.  (Amended Complaint, p. 3)  As relief, plaintiff seeks punitive, compensatory and pecuniary damages, as well as damages for physical and mental anguish, in the amount of $250,000 per defendant.  (Amended Complaint, p. 5)

---

[9]As discussed further below, while plaintiff identifies his claims as being brought under the Eighth Amendment, the alleged constitutional violations occurred during the arrest of plaintiff and the Eighth Amendment is not implicated by alleged misconduct that occurs prior to conviction.  See Bass v. Robinson, 167 F.3d 1041, 1048-49 (6th Cir. 1999) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." (quoting Ingraham v. Wright, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.E.2d 711 (1977))).  Nevertheless, plaintiff's claims need not be dismissed on that basis.  "Pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings" Boswell v. Mayer, 169 F.3d 384, 387 (6th Cir. 1999), and, in this case, the pro se plaintiff clearly alleges the use of excessive force during his apprehension and arrest.  The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[ ] in the context of an arrest or investigatory stop of a free citizen," Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Consequently, this court will construe plaintiff's complaint as alleging a violation of the Fourth Amendment, as incorporated to the States by the Fourteenth Amendment.

All defendants in this action filed dispositive motions to dismiss and/or for summary judgment (D/E #75, #78, #79). As part of those motions, defendants Adams, Szukhent, Light, Savard and Bueche argued that they are entitled to qualified immunity and summary judgment on plaintiff's excessive force claims because no genuine dispute existed with respect to those claims and defendants are entitled to judgment as a matter of law.

In response, plaintiff filed a motion requesting postponement of a decision on the motions until plaintiff could conduct further discovery (D/E #92). The discovery sought by plaintiff included (1) the audio and video recordings of the police chase, (2) the report made and filed by defendant Light pertaining to the plaintiff's arrest, and (3) the inventory and vehicle/dash camera numbers of the vehicles driven by defendants Szukhent, Adams and Light.

On November 5, 2010, this court granted in part and denied in part plaintiff's motion for a postponement (D/E #97, #98). Specifically, this court found that with respect to plaintiff's request to stay the matter in order to conduct additional discovery on defendant Light's report and defendants Szukhent, Adams and Light's vehicles, plaintiff's motion was denied because there was a full discovery period, defendants had provided evidence that they complied with those discovery requests, and plaintiff failed to comply with the requirements of a Rule 56(f) affidavit. However, with respect to plaintiff's request to stay in order to conduct additional discovery on the recordings, plaintiff's motion was granted in part. As found by this court:

> In both his motion for hearing and his Rule 56(f) affidavit, plaintiff sufficiently described how his incarceration and *pro se* status have impaired his ability to obtain the discovery. Plaintiff also established how the recordings, which

-13-

> captured the events surrounding plaintiff's apprehension and arrest, go to the
> heart of his excessive force claims and are necessary for him to respond to the
> motions for summary judgment on those claims.  Additionally, plaintiff's goes
> into great detail regarding the specific material facts he hopes to uncover through
> the recordings.  Plaintiff's arguments are proper and persuasive.

(D/E #97, p. 9).  Additionally, this court found that because the recordings were irrelevant to the

arguments made by defendants Chase, Quinn, Michigan State Police Department, State of

Michigan, Genesee County Sheriff's Department, Genesee County, Grand Blanc Township

Police Department, and Grand Blanc Township in their motions for summary judgment, there

was no need for a stay of a decision on those arguments while plaintiff conducted his additional

discovery.  (D/E #97, p. 9)  Therefore, this court only ordered that a decision on plaintiff's

excessive force claims against defendants Adams, Szukhent, Light, Savard, and Bueche be

stayed.  (D/E #98)

    With respect to the claims that did not require further discovery, this court issued a report

and recommendation finding that defendants Chase, Quinn, Michigan State Police Department,

State of Michigan, Genesee County Sheriff's Department, Genesee County, Grand Blanc

Township Police Department, and Grand Blanc Township should either be dismissed or granted

summary judgment.  However, this court also recommended that any decision on defendants

Bueche, Savard, Light, Adams and Szukhent's request for summary judgment on the excessive

force claims against them should be stayed pursuant to Fed. R. Civ. P. 56 until plaintiff has the

opportunity to conduct additional discovery.

-14-

On December 15, 2010, the Honorable Avern Cohn issued an order adopting this court's report and recommendation (D/E #106).  Judge Cohn also issued a judgment in favor of defendants Chase, Quinn, Michigan State Police Department, State of Michigan, Genesee County Sheriff's Department, Genesee County, Grand Blanc Township Police Department, and Grand Blanc Township (D/E #107).

On February 16, 2011, this court held an evidentiary hearing and heard oral argument in this case.  At the hearing, the plaintiff, the attorneys for the remaining defendants and the court viewed two visual recordings and listened to one audio recording provided by defendants. Defendants also submitted an incident report from defendant Light.

Plaintiff indicated at the hearing that he would like his oral argument to be his response to defendants' request for summary judgment.  During that oral argument, plaintiff asserted that defendants' use of force during his arrest was unreasonable and excessive because plaintiff had already surrendered by the time he was tased and assaulted.  According to plaintiff, given his compliance, there was no need for any force at all and defendants' actions violated plaintiff's constitutional rights.

**III.  Standard of Review**

The remaining defendants all move for summary judgment on the basis that there is no genuine dispute as to any issue of material fact. Fed. R. Civ. P. 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Moreover, in deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-movant. See Matsushita Electric Industrial Co., Ltd. et al. v. Zenith Radio Corp., et. al., 475 U.S. 547, 587, 106 S.Ct. 1348, 1356 (1986); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 591-92 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Once the moving party has carried his burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. The opposing party cannot merely rest upon the allegations contained in his pleadings. Rather, he must submit evidence demonstrating that material issues of fact exist. Banks v. Wolfe County Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003); Fed. R. Civ. P. 56(e). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 88 S.Ct. 1575, 1592 (1968)).

-16-

**IV.  Discussion**

Section 1983 allows plaintiffs to recover damages for injuries caused by persons acting under color of state law for violations of the U.S. Constitution or federal laws.  "A law enforcement officer's key defense to a § 1983 action is encapsulated in the concept of qualified immunity."  Drogosch v. Metcalf, 557 F.3d 372, 377 (6th Cir. 2009).  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation and internal quotation marks omitted).

When, as is the case here, the defendants raise qualified immunity as a defense, the plaintiff bears the burden of proving that the defendants are not entitled to summary judgment. Davenport v. Causey, 521 F.3d 544, 550 (6th Cir. 2008) (internal citations omitted).  "Despite this burden of proof, the facts are still viewed in the light most favorable to the plaintiff, who is the non-movant."  Id.  "If there are genuine issues of material fact, [a court] must view them most favorably to the plaintiffs."  Id.

Courts employ a two pronged, non-sequential inquiry as to whether a particular defendant is entitled to qualified immunity.  Pearson, 129 S.Ct. at 818.  Under one prong, the court determines whether a constitutional right has been violated on the facts alleged.  Id. at 815-16.  Under the other prong, the court determines whether the alleged constitutional right was "clearly established" at the time of the defendant's alleged misconduct.  Id. at 816.  If either a

-17-

constitutional right has not been violated or if that right was not "clearly established," then the defendant is entitled to qualified immunity.  Id. at 818.  Here, defendants argue that there was no constitutional violation at all.

Plaintiff brings his excessive force claims pursuant to 42 U.S.C. § 1983.  However, § 1983 does not confer substantive rights and, instead, merely provides a means to vindicate rights conferred by the Constitution or laws of the United States.  Aldini v. Johnson, 609 F.3d 858, 864 (6th Cir. 2010).  "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments.  Id.  The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[ ] in the context of an arrest or investigatory stop of a free citizen," id., while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences, see Aldini, 609 F.3d at 864.

Here, as plaintiff was a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure of the plaintiff, plaintiff's claim is governed by the Fourth Amendment's reasonableness standard.  Aldini, 609 F.3d at 865 (citation omitted). "To determine whether a constitutional violation based on excessive force has occurred, this Court applies 'the objective-reasonableness standard, which depends on the facts and

-18-

circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight.'" Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir. 2010) (quoting Fox v. DeSoto, 489 F.3d 227, 236 (6th Cir. 2007) (citing Graham, 490 U.S. at 395-96. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. The officer's subjective intentions are irrelevant to the Fourth Amendment inquiry. Graham, 490 U.S. at 397. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Binay, 601 F.3d at 647 (quoting Fox, 489 F.3d at 236 (quoting Graham, 490 U.S. at 396).

In addition to those factors, defendants correctly note how similar this case is to Dunn v. Matatall, 549 F.3d 348 (6th Cir. 2008), in which the Sixth Circuit Court of Appeals affirmed the district court's decision finding that the officers were entitled to qualified immunity because no constitutional violation occurred. In Dunn, an officer attempted to initiate a traffic stop because of the plaintiff's expired driver's license. Id. at 354. While the officer's sirens were on and lights flashing, the plaintiff led the officer on a car chase for approximately two minutes through a residential neighborhood and, during the chase, the plaintiff failed to stop at several stop signs and exceeded the speed limit. Id. Eventually, the plaintiff pulled over and dropped a set of keys outside the car as instructed. Id. at 351. The officer approached the car, told the plaintiff not to move his hands, opened the door, and attempted to pull the plaintiff from the car by grabbing his

-19-

hands and wrists.  <u>Id.</u>  A struggle ensued and the plaintiff yelled, "my seatbelt, my seatbelt."  <u>Id.</u>
A few seconds later, the plaintiff said, "I'm coming, I'm coming," and the officer, along with a
second officer who had arrived on the scene, pulled the plaintiff from the car by his arms.  <u>Id.</u>
During this process, the plaintiff lost balance and fell to the ground as one officer lost his grip on
the plaintiff's arm.  <u>Id.</u>  As a result, the plaintiff's femur was fractured.  <u>Id.</u> at 352.

 In finding that no constitutional violation occurred, the Sixth Circuit emphasized that
while the stop was initiated because of a "minor traffic violation," evading a police officer
cannot be dismissed as such and the plaintiff's flight justified a higher level of suspicion when
the plaintiff finally pulled over.  <u>Id.</u> at 354.  The court further emphasized that the officers could
not have known if the plaintiff posed a safety threat to the officers, and that it would have been
reasonable for the officers to be apprehensive that the plaintiff may have had a weapon in the car
or used the car itself as a weapon.  <u>Id.</u>  Additionally, even if the struggle to remove the plaintiff
from the car was caused by the plaintiff's seatbelt, it was apparent that the officers had a difficult
time removing the plaintiff from the car, and it was reasonable for the officers to consider the
plaintiff resistant.  <u>Id.</u> at 354-55.

 Here, viewing the evidence in a light most favorable to plaintiff, Adams tased plaintiff
through the window of the car[10] after plaintiff was finally pulled over, multiple defendants pulled

---

[10]While plaintiff identified other defendants as having tased him in his complaint,
plaintiff has no independent recollection regarding the identity of the officer who tased him and
relied on the police reports provided by defendants.  However, Adams admits that he alone tased
plaintiff and the police reports relied upon by plaintiff appear to be mistaken.  In any event,
whoever tased plaintiff would be entitled to qualified immunity and summary judgment for the

plaintiff out of the vehicle, Bueche held plaintiff down and twisted plaintiff's arm after plaintiff was pulled out of the vehicle, and Adams tased plaintiff again while plaintiff was on the ground. Considering <u>Dunn</u> and the relevant factors outlined by the Supreme Court, from the perspective of the officers on the scene and not using hindsight, this court concludes that defendants acted reasonably in attempting to neutralize a perceived threat and they are entitled to both qualified immunity and summary judgment.

Regarding the severity of the crime, plaintiff committed more than a mere traffic offense. He fled the police after a brief stop on the roadside and led them on a high-speed chase on open highways which lasted for almost five minutes and endangered multiple people and vehicles. <u>See</u>, *e.g.*, <u>Dunn</u>, 549 F.3d at 354. Moreover, the fact that plaintiff fled the police after pulling over initially gave defendants even more reason to be suspicious of plaintiff . Numerous bag were thrown or flew out the window. He failed to obey police officers commands from the time he fled the initial attempt to stop and in spite of lights and sirens. No reasonable officer could have concluded that he would not pose a danger when the stop was finally effectuated.

Regarding the threat to the safety of the police, none of the defendants could have known why plaintiff sped off, what drugs or weapons he had in the vehicle, or what kind of threat plaintiff may have posed. Plaintiff evaded attempts to pull him over, a circumstance consist with having something to hide. Moreover, plaintiff drove recklessly and appeared to resist the commands to exit his vehicle. Given those circumstances, it would have been reasonable for the

---

reasons discussed below.

-21-

defendants to be apprehensive that plaintiff may have a weapon in the car or that the car itself may be used as a weapon.  As noted by the Sixth Circuit in <u>Dunn</u>, a police officer's fear that a car could be used as a weapon is reasonable even if the car is turned off where, as was the case here, the keys are still accessible and the person pulled over had fled before.  <u>Dunn</u>, 549 F.3d at 354.

Regarding plaintiff's level of resistence, it is undisputed that, as in <u>Dunn</u>, plaintiff resisted by fleeing the initial traffic stop and leading the police on a high-speed chase. Moreover, even though plaintiff was eventually forced to stop and he turned off his vehicle, it was still reasonable for the defendants to question plaintiff's compliance.  While some of the confusion may have been caused by conflicting commands from different officers, everything happened very quickly and defendants, including Adams, had little time to determine if plaintiff was actually following orders this time before deciding whether to tase him and pull him from the car.  Similarly, even if plaintiff's resistence to being handcuffed was the result of his physical reaction to being tased, he did resist and only a few seconds elapsed between the time he was pulled out of the car and the time he was held down and tased, which meant that police officers like Bueche and Adams had little opportunity to gauge plaintiff's compliance and supports the reasonableness of defendants' actions.

Defendants point to plaintiff's lack of injury in support of their arguments, but a plaintiff may allege an excessive force claim and survive a summary judgment motion "even where the physical contact between the parties did not leave excessive marks or cause extensive physical

-22-

damage." Miller v. Sanilac County, 606 F.3d 240, 252-4 (6th Cir. 2010) (reversing a district

court's granting of summary judgment on an excessive force claim where the plaintiff alleged

that the officer slammed the plaintiff into a vehicle when the arrestee posed no immediate threat

to safety and the arrestee had not attempted to escape.").  Nevertheless, the overall record in this

case clearly demonstrates that there is no genuine dispute and defendants are entitled to

judgment as a matter of law.  Given the heightened suspicion and danger brought about by the

car chase and the fact that the officers could not know what other dangers may have been in the

car, Adams tasing plaintiff and defendants forcibly removing him from the car to contain those

potential threats were objectively reasonable.  Likewise, in light of plaintiff's resistance to being

handcuffed, Bueche holding him down and Adams tasing him again were also objectively

reasonable.

Therefore, no genuine dispute exists with respect to whether a constitutional violation

occurred and the remaining defendants are entitled to both qualified immunity and summary

judgment on plaintiff's excessive claim.  Moreover, as plaintiff's claims regarding a failure to

protect him[11] and a cover-up of the excessive force are both dependent on his excessive force

claims, defendant should be granted summary judgment on those claims as well and this case

should be closed.

---

[11]"A police officer who fails to act to prevent the use of excessive force may still be held
liable where '(1) the officer observed or had reason to know that excessive force would be or
was being used, and (2) the officer had both the opportunity and the means to prevent the harm
from occurring.'"  Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008) (quoting Turner v.
Scott, 119 F.3d 425, 429 (6th Cir.1997)).

**V. Conclusion**

For the reasons discussed above, this court now recommends that defendants Adams, Szukhent, Light, Savard and Bueche also be granted summary judgment on all claims against them and this case be closed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan                    
Virginia M. Morgan

Dated: April 14, 2011          United States Magistrate Judge

-24-

_____

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and Terrence

Garrett via the Court's ECF System and/or U. S. Mail on April 14, 2011.

<u>s/J. Johnson</u>

Case Manager to

Magistrate Judge Virginia M. Morgan
